UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DEMETRIUM SHAW

      Petitioner,

                           Case No.  8:15-CV-2207-T-30MAP
                                      8:09-CR-251-T-30MAP

UNITED STATES OF AMERICA,

      Respondent.

_____/

O R D E R

    This cause comes on for consideration of Petitioner's Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Judgment and Sentence by a Person in Federal Custody (Cv-D-1, Cr-D-284), and the United States' response in opposition thereto (Cv-D-6).

    By way of background, in July 2009, Petitioner was charged in an indictment with possession with the intent to distribute 50 grams or more of cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(iii) and being a felon in possession of ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924(d).  The drug offense carried a mandatory minimum term of imprisonment of 10 years.  Petitioner retained attorney Joseph Caimano to represent him.  On August 3, 2009, the Government filed its Information and Notice of Prior Convictions pursuant to 21 U.S.C. § 851 placing Petitioner on notice that he faced an enhanced penalty of a mandatory minimum 20 years as to the drug offense due to a prior felony drug offense.  (Cr-D-33.)

Defense counsel filed two motions to suppress evidence obtained from the April 3, 2009, search of Petitioner's home and vehicle pursuant to a warrant.  The Court denied the motions to suppress after a hearing.  On September 22, 2009, a grand jury returned a superseding indictment against Petitioner which added a conspiracy count charging from at least 2005 the Petitioner and others conspired to possess with the intent to distribute 50 grams or more of crack cocaine.  (Cr-D-59.)

Petitioner proceeded to trial.  At trial, the Government presented testimony from numerous law enforcement witnesses. Through their testimony, the Government presented evidence that Darren Bettard and Eddie Light were street-level dealers for Petitioner from whom law enforcement had purchased quantities of crack cocaine. Law enforcement used the purchases of crack cocaine to obtain a search warrant of Petitioner's residence.  They executed the warrant on April 3, 2009.  The evidence presented showed that, just prior to the execution of the warrant, Bettard got into Petitioner's truck.  A search of the truck revealed a book bag or backpack containing drugs and drug paraphernalia.

The Government further presented testimony of two witnesses who hoped to gain more favorable treatment in their own cases. Eddie Light, a cooperating co-defendant, testified that he had lived in Plant City prior to being incarcerated and met Shaw in the fall of 2005 when Light was selling marijuana and crack on the

streets. (Cr-D-134, p. 7, 9-10.) Light testified that Shaw was a known drug dealer. Light explained that the first time he dealt with Petitioner on a "business level," Light flagged down Petitioner to buy some crack and marijuana. (Id. at p. 11.) According to Light, Petitioner became Light's supplier. (Id. at 13.) Light explained that eventually he started going to Petitioner's house to buy drugs. (Id. at p. 14.) Light testified that on the first occasion he went to Shaw's house, Petitioner, who had a person with him by the name of "Tahonie," picked Light up and drove to the house on Forrest Street to get the drugs. (Id. at p. 14-15, 18-19.) Light testified that, beginning in 2005 through 2009, he regularly bought crack from Shaw in quantities ranging from seven to 63 grams. (Id. at p. 9-37.)

Light testified about the four occasions on which undercover detectives bought drugs from Light. Light stated that he obtained the drugs from Shaw on three out of the four occasions. (Id. at p. 39-53; D-131, p.35.)

James Donnell Oner testified that he knew Shaw and identified him in court. (D-125, p. 7.) Oner testified that in the fall of 2006 he was selling crack and that his initial supplier was Corey Dunn. (Id. at p. 8, 10.) According to Oner, Dunn told him that Petitioner, who Dunn referred to as "Meechi," was Dunn's supplier. (Id. at p. 10-12.)

Oner testified about two occasions that he dealt with Shaw.

3

The first occasion was when Dunn, Petitioner, and "Carey" came to
Oner's trap house in Lakeland. (Id. at p. 12.)  Oner explained
that he had called Carey to obtain crack cocaine and that Carey and
Dunn showed up in a black four-door truck driven by Petitioner.
(Id. at 12-13.)  Oner explained that he got into the back of the
truck and saw Petitioner hand Carey a bag.  Then Oner, Dunn, and
Carey exited the truck and, once inside the trap house, Oner
purchased approximately 13 packs with eight "rocks" each,
equivalent to 42 grams of crack, for $900.  Oner explained that the
crack was retrieved from the bag Petitioner gave to Carey. (Id. at
p. 13-16.)

Oner testified that the second occasion he dealt with Shaw was
around April 2007.  Oner stated that he called Carey to buy some
cocaine for a friend.  Oner explained that he drove to Plant City
to Petitioner's house where Shaw was waiting in his truck.
According to Oner, Petitioner sent Carey into the house and when
Carey returned, Carey and Oner got into Shaw's truck.  Oner
testified that Carey then weighed the cocaine and Oner paid Shaw
$1,600 for the drugs. (Id. at p. 16-19.)

Oner testified that after the second occasion he had no
further direct contact with Petitioner. (Id. at p. 20.)  He said
he continued to buy crack cocaine from Dunn and on a few occasions
he took Dunn to Petitioner's house to obtain the drugs. (Id. at p.
20-23.)  Oner testified that Dunn told him he was getting the crack

4

from Shaw.  (Id. at p. 24.)

On cross-examination, Oner testified that he knew Eddie Light and that they had the same attorney.  (Id. at p. 28.)  Oner explained that he met Light in the Pinellas County Jail and that they were housed in the same dorm unit.  According to Oner, when Light told Oner about Light's drug charges, Oner advised Light that he should try to reduce his sentence by cooperating.  (Id. at p. 29-30.)

Oner testified that Light told him that Light was cooperating against Shaw and that Shaw was going to trial.  (Id. at p. 32-33.) After Oner learned from Light that Petitioner was awaiting trial, Oner asked his attorney to contact law enforcement about Oner providing cooperation as well.  (Id. at p. 36. 43.)  Oner admitted that he didn't tell Light he wanted to cooperate against Petitioner.  According to Oner, when Light learned that Oner was going to testify on the Government's behalf at Shaw's trial, Light became angry and stopped talking to Oner.  (Id. at p. 43-44.)  Oner testified that he and Light never discussed details of their testimony.  (Id. at 44-45.)

Attorney Caimano attacked the credibility of the cooperating witnesses on cross examination and during his closing argument.  He argued that there was no evidence that Petitioner knowingly possessed the bag found inside his truck on April 3, 2009.  He specifically pointed out there was no evidence that Bettard didn't

place the backpack in the back seat of the truck.   (Cr-D-207, p. 56, l. 7-9.)  With regard to the ammunition offense, Caimano argued that the Government never placed Petitioner at the residence within the last couple of months relevant to the superseding indictment. (Id. at p. 59. 1-8.) He further argued that there was no evidence Petitioner ever possessed the ammunition or that Petitioner was ever at the residence after the ammunition was placed in the closet.   (Id. at p. 58, l. 14-25.) On October 29, 2009, a jury found Petitioner guilty of the drug offenses charged in the Superseding Indictment but not guilty of the ammunition offense.

Prior to sentencing, Petitioner twice sought a new trial based on what he alleged to be "newly discovered evidence" which he claimed demonstrated that Government witnesses James Oner and Eddie Light falsely testified at trial.  By order dated February 26, 2010, the Court denied without prejudice Petitioner's first motion for new trial as Petitioner failed to submit any actual evidence supporting his allegations.  By order dated May 17, 2010, the Court denied the second motion for new trial without an evidentiary hearing.

Petitioner next attempted to challenge in state court his prior drug felony that was the basis of the § 851 enhancement.  His motion for post-conviction relief was denied.

The Court held a hearing on October 26, 2010, at which attorney Caimano argued that the drug offenses for which Petitioner

was convicted involved 4070 grams of crack cocaine. (Cr-D-212, p. 9.)   Caimano initially stated that the drug quantity was his submission but that "Mr. Shaw may disagree with that...." (Id. at p. 9, l. 24-25.)   The Court responded, "All right.  As long as he understands that through you it's his position." (Id. at p. 10, l. 2-3.)   Caimano responded, "just a moment, Judge.  I'm prepared to say that he agrees with me.  I don't know if the Court -- the Government would want to hear it on the record for purposes of this factual distinction.  He says he agrees with me." (Id. at p. 10, l. 2-8.)   The Government did not agree with the defense's drug quantity submission and instead argued that the offenses involved 5896 grams of crack cocaine.  The Court recessed the hearing to give counsel an opportunity to resolve the issue of drug quantity.

The parties reconvened on October 28, 2010, for the final sentencing hearing.  At that time, the Government argued that the offenses involved 5796 grams of crack cocaine. (Cr-D-218, p. 11.) Attorney Caimano concurred.  (Id. at p. 12.)   During allocution, Petitioner maintained his innocence and stated, "I do remain that I'm truly innocent of this [sic] charges brought against me...." (Id. at p. 30, l. 5-8.)

The Court sentenced Petitioner to a term of imprisonment of 240 months.  Petitioner appealed his conviction and sentence.  He argued that: (1) this Court erred in denying his motion to suppress; (2) this Court erred in denying his motion for new trial;

7

and (3) this Court should have sentenced him under the Fair Sentencing Act (FSA). The Government filed a Concession of Error and requested the Eleventh Circuit to vacate Petitioner's sentence and remand for resentencing under the FSA.

In the meantime, Petitioner filed a <u>pro se</u> motion seeking a new trial based on what he again claimed to be "newly discovered evidence." On October 7, 2011, the Court denied the motion. Petitioner appealed the denial of the motion. On February 29, 2012, the Eleventh Circuit found the appeal was frivolous and denied Petitioner's motion to proceed <u>in forma pauperis</u> on appeal.

On July 13, 2012, the Eleventh Circuit affirmed Petitioner's conviction but vacated his sentence and remanded the case for ressentencing under the FSA. <u>United States v. Shaw</u>, 472 Fed. Appx. 887 (11th Cir. 20102) (per curiam). On October 2012, this Court held a hearing. At that time, Petitioner, who was represented by his appellate attorney Andres Oliveros, requested new counsel based on a conflict of interest. The Court granted the motion and appointed the Office of the Federal Public Defender to represent Petitioner.

On December 6, 2012, the Court held a resentencing hearing. AFPD Jenny Devine argued the trial testimony established the offenses involved 1932.2 grams of crack cocaine. (Cr-D-270, p. 6-7.) She further argued that the 20-year minimum mandatory was not applicable because the jury found that the drug offenses involved

8

50 grams or more of crack cocaine rather than 280 grams required under the FSA.    The Court noted that attorney Caimano had stipulated at the prior sentencing hearing to a quantity of 5796 grams of crack cocaine. (Id. at p. 10-11.)  The Court adopted the PSR finding that Petitioner was responsible for 5896.8 grams of crack cocaine and, as such, found that the mandatory minimum sentence was 20 years.   The Court sentenced Petitioner to 240 months as to each Counts One and Two to run concurrent.  Petitioner again appealed.

On appeal, the Eleventh Circuit found that this Court erred in imposing the mandatory minimum sentence of 10 years imprisonment, enhanced to 20 years due to the prior conviction, based on the Court's finding that the crimes involved 280 grams or more of crack.  United States v. Shaw, 561 Fed. Appx. 860 (11th Cir.)(per curiam), cert. denied, 135 S.Ct. 508 (2014).  The Eleventh Circuit found the error harmless however because the uncontroverted evidence demonstrated beyond a reasonable doubt that Petitioner's crimes involved over 280 grams of crack cocaine.    The Eleventh Circuit explained:

> The trial testimony of one of Shaw's buyers established that Shaw's crimes involved thousands of grams of crack cocaine over a period of four years. Based on that testimony, the PSI found Shaw responsible for 5896.8 grams of crack.  Importantly, in objecting to the offense level computation in the PSI, Shaw argued only that he should be held accountable for 4070 grams of crack, instead of 5896.8 grams, based on the buyer's testimony.   Shaw also maintained in his sentencing memorandum that the testimony gave rise to a calculation

of 4243.2 grams of crack.  Similarly, in his sentencing
memorandum on remand, Shaw argued that a five-year
mandatory minimum was applicable under the FSA, as the
jury only convicted him of crimes involving fifty grams
or more of crack, but he conceded that the buyer's
testimony demonstrated that Shaw's offenses involved over
1900 grams of crack.

In addition, defense counsel concurred at the
original sentencing with the prosecutor's calculation of
5796 grams.  Shaw argues on appeal that his counsel's
concurrence was only to the offense level, and not to the
drug quantity, but that argument is contradicted by a
plain reading of the hearing transcript.  In any event,
even if we disregard defense counsel's concession at the
original sentencing, the record nevertheless demonstrates
beyond a reasonable doubt that Shaw repeatedly conceded
to a crack-cocaine quantity of well over 280 grams.

Moreover, although Shaw argues that the jury could
have found that he was guilty of crimes involving more
than fifty but less than 280 grams of crack by rejecting
the testimony of Shaw's buyer, the evidence in the record
could not rationally lead to such a finding, especially
considering Shaw's own concessions as to quantity.  Thus,
we find that the uncontroverted evidence in the record
supports a finding that Shaw's crimes involved well over
280 grams of crack and that the district court's <u>Alleyne</u>
error in imposing the ten-year mandatory minimum despite
the lack of a jury finding to that effect was therefore
harmless....

<u>Id.</u> at 865.  The Eleventh Circuit therefore affirmed the 240-month

sentence.  <u>Id.</u>

Petitioner timely filed his § 2255 motion alleging various

claims of ineffective assistance of counsel.  Specifically,

Petitioner claims that attorney Caimano failed to adequately

investigate the case.  With regard to this claim, Petitioner

asserts that his counsel failed to interview witnesses and present

these same witnesses at trial.  He further contends that his

10

counsel was ineffective in conceding to drug quantity.  Finally, he claims the Caimano misrepresented his trial strategy.

### Ineffective Assistance of Counsel

Claims of ineffective assistance of counsel require a showing of the two-prong test as set forth by the Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984).  In order to succeed under the Strickland test, a movant has the burden of proving: (1) deficient performance by counsel; and (2) prejudice resulting therefrom.  Id. at 687.

The first prong of the Strickland test requires the Court to determine whether trial counsel performed below an "objective standard of reasonableness," while viewing counsel's challenged conduct on the facts of the particular case at the time of counsel's conduct.  Id. at 690.  Notably, there is a strong presumption that counsel rendered adequate assistance and made all significant decisions with reasonable and competent judgment.  Id.

A counsel's performance is deficient if, given all the circumstances, his performance falls outside of accepted professional conduct.  Strickland, 466 U.S. at 690.  "Judicial scrutiny of counsel's performance must be highly deferential," and "counsel cannot be adjudged incompetent for performing in a particular way in a case, as long as the approach taken "might be considered sound trial strategy."  Chandler v. United States, 218 F.3d 1305, 1313-14 (11th Cir.2000) (en banc) (quoting Strickland,

11

466 U.S. at 689 and <u>Darden v. Wainwright</u>, 477 U.S. 168 (1986)). Rather, for counsel's conduct to be unreasonable, a petitioner must show that "no competent counsel would have taken the action that his counsel did take." <u>Chandler</u>, 218 F.3d at 1315.

With regard to the second prong, a reasonable probability is a "probability sufficient to undermine confidence in the outcome." <u>Strickland</u>, 466 U.S. at 694. A petitioner must show a "substantial, not just conceivable, likelihood of a different result." <u>Cullen v. Pinholster</u>, 131 S.Ct. 1388, 1403 (2011) (citation omitted). Petitioner must "affirmatively prove prejudice" to meet the second prong of an ineffective assistance of counsel claim. <u>Strickland</u>, 466 U.S. at 693.

If a petitioner does not satisfy both prongs of the <u>Strickland</u> test, "he will not succeed on an ineffective assistance claim." <u>Zamora v. Dugger</u>, 834 F.2d 956, 958 (11th Cir. 1987). <u>See also</u> <u>Weeks v. Jones</u>, 26 F.3d 1030, 1037 (11th Cir. 1994). Therefore, a court may resolve a claim of ineffective assistance of counsel based solely on lack of prejudice without considering the reasonableness of the attorney's performance. <u>Waters v. Thomas</u>, 46 F.3d 1506, 1510 (11th Cir. 1995) (citing <u>Strickland</u>, 466 U.S. at 697).

With this standard in mind, the Court turns to the claims asserted by Petitioner.

## I.   Pretrial Investigation & Failure to Call Witnesses at Trial

Petitioner first claims that Caimano failed to conduct an adequate pretrial investigation by failing to interview witnesses he identifies as Kerry Strong, Carolyn O'Neal, Corey Dunn, Marvin Wright, and Constance Thomas.  While making this claim, at the same time, Petitioner admits that Caimano "performed a cursory inquiry" of all the witnesses "except possibly Kerry Strong."  (Cv-D-1, p. 4.)  He claims these witnesses, as well as Darren Bettard and Jeff Woodcock, would have impeached Government witnesses and have supported an "affirmative or alibi defense."  (Id.)

An attorney's failure to conduct adequate pretrial investigation can support a claim of ineffective assistance of counsel.  Solomon v. Kemp, 735 F.2d 395, 402 (11th Cir. 1985).  However, "in the course of a pre-trial investigation, counsel for a criminal defendant is not required to pursue every path until it bears fruit or until all available hope withers."  Id. (citation omitted).  Furthermore, attorneys are generally not held to be constitutionally ineffective because of tactical decisions or strategies.  United States v. Guerra, 628 F.2d 410, 413 (5th Cir. 1980).  An attorney's decision to pursue a particular defense may constitute a tactical decision or trial strategy within the range of reasonable performance and such a decision can amount to ineffective assistance "only if it was so patently unreasonable that no competent attorney would have chosen it."  Adams v.

13

Wainwright, 709 F.2d 1443, 1445 (11th Cir. 1983).

Presentation of witness testimony is a matter of trial strategy. Buckelew v. United States, 575 F.2d 515, 521 (5th Cir. 1978); Blanco v. Singletary, 943 F,2d 1477, 1495 (11th Cir.1991) ("The decision as to which witnesses to call is an aspect of trial tactics that is normally entrusted to counsel"). "Which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess." Waters v. Thomas, 46 F.3d 1506, 1512 (11th Cir.1995) (en banc).

Petitioner has the burden to establish facts showing counsel's failure to call witnesses rendered his trial fundamentally unfair. Coon v. United States, 441 F.2d 279 (5th Cir. 1971). Petitioner's burden in this regard is heavy "since the presentation of testimonial evidence is a matter of trial strategy and often allegations of what a witness would have testified to are largely speculative." Guerra, 628 F.2d 410, 413 (citation omitted).

A.   Carolyn O'Neal & Marvin Wright

Contrary to his initial claim that Caimano failed to interview witnesses identified by Petitioner, Petitioner admits that Caimano both interviewed and subpoenaed Marvin Wright and Carolyn O'Neal to appear at trial. Caimano, however, admittedly ultimately did present them as witnesses at trial. Petitioner filed affidavits from both O'Neal and Wright relating to their proposed testimony.

14

Ms. O'Neal states that she was with Petitioner in his truck on the evening of April 3, 2009, when Petitioner left after receiving a phone call.  O'Neal states that Petitioner told her he had to give someone a ride.  O'Neal further states that at no time did she see a black book bag in the truck.  She states she was subpoenaed to testify at trial and was present in court but was never called to testify.  (Cv-D-1, p. 20.)

Wright states that he witnessed Petitioner come home in a Nissan truck on April 3, 2009.  He heard police yell and saw a deputy approach the truck as Darren Bettard entered the passenger side of the truck carrying a black book bag.  Wright states that at no time did he see Petitioner with a black book bag.  He further states that he was subpoened to testify at trial but was never called.  (Id. at p. 24-25.)

Attorney Caimano states in his affidavit he indeed interviewed Wright.  According to Caimano, Wright lived next door to Petitioner and was clear that he saw Petitioner coming and going from the house in the days immediately prior to Petitioner's arrest.  According to Caimano, Wright told Caimano that on the evening of Petitioner's arrest, he saw Bettard standing outside the home with no possessions.  After Petitioner drove up, Bettard went from the truck to the inside of the house and returned carrying a bag.  Law enforcement then moved in.  (Cv-D-6-3, Exh. C, p. 2.)

Caimano attests that he made the strategic decision not to

15

call Wright at trial because the Government did not introduce any evidence that Petitioner was present in the house in the weeks prior to the execution of the warrant.  According to Caimano, that lack of evidence allowed him to argue that Petitioner was not guilty of the ammunition offense and in fact the jury  found Petitioner not guilty of that offense.  (Id. at p. 2-3.)

Caimano attests that calling Wright to testify at trial would have had a detrimental effect on Petitioner's defense as it would have: (1) allowed the Government to establish Petitioner had recently been inside his residence thereby negating the defense's argument that the ammunition was placed there after Petitioner was present; (2) drawn attention to the fact that the book bag containing drugs found in Petitioner's truck had the name "D.J. Shaw," the name of Petitioner's young son; and (3) allowed the Government to argue that Bettard had to wait for Petitioner to access the residence to retrieve the book bag at Petitioner's request.  (Id. at p. 3.)

Petitioner, by his own admission, has not shown Caimano failed to interview Wright or O'Neal.  He also has not demonstrated that attorney Caimano acted deficiently in failing to call Wright or O'Neal to testify for the defense at trial.   In this regard, Petitioner has not shown that Caimano's failure to call O'Neal or Wright to testify was an unreasonable strategic move no competent counsel would have made.  Simply put, both O'Neal and Wright's

testimony would have been potentially more damaging to Petitioner's defense than helpful. As explained by Caimano, had he presented testimony related to the Bettard's possession of the book bag, it would have allowed the Government an opportunity to introduce evidence that the book bag had Petitioner's son's name on it, a fact the Government had not introduced. Additionally, had Wright testified, his testimony regarding Petitioner's presence at the residence in the days before the execution of the search warrant would have contradicted Petitioner's successful defense that the ammunition was placed at the residence sometime after Shaw's last visit to the residence. Finally, given the harm the proposed testimony could have caused, Petitioner has failed to show prejudice resulting from Caimano's failure to present Wright and O'Neal as witnesses.

### B. Corey Dunn

Petitioner claims that Corey Dunn, who did not testify at trial, would have contradicted James Oner's trial testimony. Petitioner submitted an affidavit purportedly attested to by Corey Dunn. The affidavit states in pertinent part:

> I have reviewed the testimony of James Oner as it regards myself. Mr. Oner testified that when he supposedly purchased drugs from Mr. Shaw I was with him. I was never with Mr. Oner when he supposedly purchased drugs from Mr. Shaw. This testimony is false.

(Cv-D-1, p. 282, ¶ 2.)

First, the affidavit allegedly signed by Dunn is suspect.

17

Notably, the signature in no way matches the signature on a letter signed by Adrian Corey Dunn on March 8, 2010, and previously submitted by Petitioner in support of his motion for new trial. (Cr-D-136, Exh. 3.) Furthermore, while the affidavit was notarized by Kenyatta Marell Shaw (an apparent relative of Petitioner) on March 18, 2015, the notary jurat does not comply with Fla. Stat. §§ 117.05(4)(f) and (5). Specifically, the jurat does not include the type of identification, either based on personal knowledge or the specific type of identification the notary is relying upon in identifying the signer of the affidavit. See id. This alone makes the affidavit invalid.

In any event, Petitioner fails to demonstrate that Caimano was ineffective in failing to interview Dunn and present his testimony at trial. Petitioner fails to show that Dunn was willing to speak with Caimano or that he would have testified at trial. On the other hand, attorney Caimano specifically states in his affidavit that he attempted to contact Dunn but there was no response and Dunn never contacted Caimano to testify at trial. (Cv-D-6-3, Exh. C, ¶7.) Significantly, this statement is consistent with Petitioner's previous admission in his motion for new trial that counsel was unable to locate Dunn until "well after trial" and could not get him to give a statement until March 8, 2010. (Cr-D-136, p. 12.) Thus, Petitioner's own evidence does not support a finding that Dunn would have testified at Petitioner's trial if

18

called to do so.  As such, Petitioner fails to meet both prongs of the <u>Strickland</u> test.

### C.   Kerry Strong

It is unnecessary to go in to specific detail regarding the affidavit of Kerry Strong.[1]  He essentially states in his affidavit that Oner's testimony was false.  Notably, Strong acknowledges, "[p]rior to the trial of Mr. Shaw, I was a fugitive from justice and was not available to testify but would testify now should I be called."  (Cv-D-1, p. 22, ¶ 7.)

Petitioner previously submitted an affidavit by Strong in support of his third motion for new trial.  (Cr-D-225, p. 21-22.) Therefore, Strong admitted that prior to and during Petitioner's trial Strong was a fugitive from the law and was evading law enforcement, Petitioner, and the attorneys related to the case. (<u>Id.</u> at p. 22, ¶ 9.)  Here again, Strong concedes he was "not available" to testify at Petitioner's trial.  Given that Strong was purposely evading Petitioner's counsel and his admission he "was not available" to testify at trial, Petitioner cannot show counsel's actions in failing to interview him or call him to testify at trial were constitutionally insufficient or any resulting prejudice.

---

[1]   The affidavit, similarly notarized by Kenyatta Marell Shaw on March 18, 2015, suffers from the same legal insufficiencies as Dunn's purported affidavit.  In this regard, the notary jurat does not comply with Fla. Stat. §§ 117.05(4)(f) and (5) in that it does not include the type of identification the notary relied on in identifying Strong.

D.    Tahonie Joyce

Petitioner also appears to contend that his counsel should have called Tahonie Joyce to testify.  He contends that Joyce's testimony would have contradicted Eddie Light's testimony that Joyce was present on an occasion when Petitioner sold drugs to Light.

Significantly, Petitioner did not submit an affidavit from Joyce.  In fact, he previously admitted in his first motion for new trial that "Tahonie Joyce was not interested in signing affidavits."  (D-136, p. 13.)

In support of his second motion for new trial, Petitioner submitted an affidavit purportedly signed by Joyce.  (D-225, p. 15-16.)  The affidavit included a statement that, "[p]rior to and during the above-captioned federal trial involving Mr. Shaw, I was not interested in testifying in this case, and was evading law enforcement officers, Mr. Shaw, and attorneys related to the above-captioned case."   (Id. at p. 16, ¶ 9.)   As Joyce previously admitted he avoided Shaw's attorney and was not interested in testifying, Petitioner has not demonstrated that Caimano acted deficiently in his failure to interview and call Joyce to testify at trial or any resulting prejudice.

E.    Darren Bettard and Jeff Woodcock

Petitioner contends that Bettard admitted in an interview with private investigator Jeff Woodcock that Bettard was in sole

20

possession of the book bag and the contents thereof.  He contends that Caimano should have called Bettard or Woodcock to testify at trial.

Caimano explains in his affidavit that Bettard stated in a pretrial interview that Petitioner asked him to go in to the residence to retrieve the bag and that Bettard had no knowledge of what was inside of the bag.  He also states that it was not known whether the Government would call Bettard to testify in rebuttal, which Caimano felt would be very damaging to the case.  (Cv-D-6-3, Exh. C, p. 2-3.)

Caimano's decision not to call Bettard was a strategic decision that was not so unreasonable such that no competent attorney would have made the same decision.  The Court notes that at Petitioner's bond hearing, Caimano explained that while Bettard told Caimano's investigator that he was in possession of the bag, "he won't go so far as to say it was his...."  (Cr-D-31, p. 16.) Given this statement and his statement that Petitioner asked him to retrieve the bag and that Bettard had no knowledge as to what was in the bag, Bettard's testimony could have been much more damaging to Petitioner's defense than helpful.  Under the circumstances, Petitioner has failed to demonstrate constitutionally deficient assistance of counsel or resulting prejudice.

Similarly, Petitioner fails to meet both prongs of the <u>Strickland</u> test with regard to Caimano's failure to call Woodcock

to testify.   Assuming Woodcock's proposed testimony relating to Bettard's pretrial interview would not have been inadmissible hearsay, like Bettard's proposed testimony, it could have been more damaging to Petitioner's defense than helpful.

## II.  Drug Quantity

Petitioner next argues that his counsel "stipulated to a drug weight that altered the district court's sentencing jurisdiction and effectively admitted Mr. Shaw's guilt to a more severe crime than the facts otherwise proved.  Mr. Shaw did not understand the consequences of the stipulation, if he had known of the consequences, he would not have agreed to the 'fact' nor allowed Mr. Caimano to agree to the 'fact.'" (Cv-D-1, p. 12.)

Petitioner concedes that at the October 26, 2010 proceeding he, through attorney Caimano, stipulated to a drug quantity of 5796 grams of crack cocaine.[2]  He, however, claims that attorney Caimano did not explain the stipulation to him or how it affected the mandatory minimum sentence.  Petitioner argues that had his counsel not stipulated, the drug weight would have dropped below the FSA required threshold of 280 grams, and as such, he would have faced a mandatory minimum 10 year sentence rather than 20 years.

The  Court  need  to  decide  whether  counsels'  stipulations

---

[2] Petitioner makes no mention of attorney Devine's suggestion at the resentencing hearing that the offenses involved 1900 grams of crack cocaine.

regarding drug quantity constitute ineffective assistance because Petitioner must also show prejudice resulting from his attorneys' conduct.   Specifically, Petitioner must show that there is a reasonable probability that his sentence outcome would have been different had his counsel objected to the drug quantity.   He has not done so.

Initially, the evidence at trial demonstrates the offenses involved a quantity of crack cocaine in excess of 240 grams just in the months of March and April 2009.   Specifically, the undercover agents made four purchases of crack cocaine from Eddie Light on March 11, 13, 18, and 31, 2009.   The quantities were for crack cocaine in the amounts of 7, 8.5, 15.9 and 38.6 grams.   (Cr-D-205, p. 173-196; PSI ¶ 9-12.)   The April 3, 2009 search of Petitioner's vehicle and residence revealed 173.2 grams of crack cocaine.   (PSI ¶ 14.)   Thus, the amount of crack cocaine from these 5 dates is 243.2 grams.   Furthermore, Light's trial testimony supports a finding of thousands of grams of crack over a four year period. (Cr-D-134, p. 9-67; Cr-D-206, p. 5-41.)

Additionally, as indicated above, the Eleventh Circuit found that the record could not "rationally lead" to a finding that the jury could have found that he was guilty of crimes involving less than 280 grams of crack. Shaw, 561 Fed. Appx. at 865.   Once there was a finding of 280 grams, the mandatory minimum sentence of 10 years, enhanced to 20 years, was required and any contest of a drug

quantity beyond 280 grams would not have changed Petitioner's sentence.   Having failed to show prejudice, Petitioner is not entitled to relief as to this claim.

## III. Trial Strategy

Petitioner's final claim is that attorney Caimano misrepresented the trial strategy.  Petitioner claims that Caimano told him he was interviewing witnesses he planned to present at trial who would contradict the Government's case.   Petitioner continues that attorney Caimano did not interview the witnesses and did not call any to testify at trial.  He claims that had he known that Caimano was unprepared or was not going to use the agreed upon plan, he would not have proceeded to trial with Caimano as counsel and would have retained "loyal" counsel.  Alternatively, he claims he would have pled guilty prior to the § 851 enhancement or would have taken a plea offer from the Government.

The Government responds that Caimano's trial tactics were sound and reasonable and do not amount to ineffective assistance of counsel.   It further argues that Petitioner was never offered a plea to an unenhanced sentence.

For the reasons previously stated in section I., the Court finds that Caimano's representation of Petitioner was not constitutionally deficient.  As explained above, Caimano in fact interviewed witnesses but made the strategic decision not to present their testimony at trial as it potentially could have

severely damaged the defense.

Additionally, Petitioner fails to demonstrate prejudice. While Petitioner states that he would have obtained "loyal counsel" (Cv-D-1, p. 14), he has not shown that there is reasonable probability that the outcome would have been different had he secured different counsel for the trial phase of the case.  Nor has Petitioner shown that there is a reasonable probability that his sentence would have been different had he pled guilty.  According to Caimano, the Government made a plea offer to Petitioner to plead to possessing with the intent to distribute 50 grams of cocaine base in exchange for dismissal of the ammunition charge.  Caimano points out the plea agreement indicated an enhanced minimum mandatory of 20 years, and that Petitioner rejected the offer.  (Cv-D-6-3, Exh C, p. 5, ¶ 8; Cv-D-6-2, p. 3, ¶ 2.)

The offered plea agreement specifically provided that "Count One is punishable by an enhanced mandatory minimum term of imprisonment of 20 years up to life...."  Id.  While the plea agreement included a provision that the Government would withdraw the § 851 notice providing for an enhanced penalty, its doing so was dependent on Petitioner's full cooperation and provision of substantial assistance warranting the filing of a downward departure by the Government.  (Id. at p. 6, ¶ 10.)

There is simply no evidence that Petitioner was ever willing to cooperate with the Government and provide substantial assistance

let alone that any assistance provided by him would have resulted in the Government withdrawing the § 851 enhancement. To the contrary, Petitioner claimed innocence at sentencing. (Cr-D-218, p. 30, l. 5-8.) Even now, he does not state that he would have cooperated in the investigation and prosecution of other persons. In fact, he does not even seek to plead guilty. Rather, Petitioner requests a new trial or for the Court to reduce his sentence to 10 years. (Cv-D-1, p. 15.)

## IV. EVIDENTIARY HEARING

Petitioner has failed to demonstrate the need for an evidentiary hearing. The Court need not conduct an evidentiary hearing where it is evident from the record that the petitioner was not denied effective assistance of counsel. <u>Diaz v. United States</u>, 930 F.2d 832, 834 (11th Cir. 1991). Based on the foregoing analysis, the Court does not find that an evidentiary hearing is warranted.

It is therefore ORDERED that:

1) Petitioner's Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence (Cv-D-1; Cr-D-284) is DENIED.

2) The Clerk is directed to enter judgment in favor of the Government and CLOSE this case.

## CERTIFICATE OF APPEALABILITY AND

## LEAVE TO APPEAL IN FORMA PAUPERIS DENIED

IT IS FURTHER ORDERED that Petitioner is not entitled to a certificate of appealability. A prisoner seeking a motion to vacate has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Rather, a district court must first issue a certificate of appealability (COA). Id. "A [COA] may issue … only if the applicant has made a substantial showing of the denial of a constitutional right." Id. at § 2253(c)(2). To make such a showing, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further,'" Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n. 4 (1983)). Petitioner has not made the requisite showing in these circumstances. Finally, because Petitioner is not entitled to a certificate of appealability, he is not entitled to appeal in forma pauperis.

DONE AND ORDERED at Tampa, Florida this _10th_ day of March, 2016.

WILLIAM J. CASTAGNA
SENIOR UNITED STATES DISTRICT JUDGE

27